**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO: 20-cv-61483-RAR

HALLMARK SPECIALTY INSURANCE
COMPANY,

      Plaintiff,

v.

LION HEART SURGICAL SUPPLY
LLC, LION HEART SURGICAL
SUPPLY CORP., FABIAN CONDE,
JANAINA D. NASCIMENTO,
JOHNSON & JOHNSON, ETHICON,
INC. AND ETHICON, US, LLC, XS
SUPPLY, LLC, JON M. BIRD, TYLER
BERGER, IVAN RODIMUSHKIN,
DAVID W. LONGDUE III, and
BRENDAN THOMAS

      Defendants,

*and*

LION HEART SURGICAL SUPPLY
CORP., FABIAN CONDE, JANAINA D.
NASCIMENTO,

      Counter-Plaintiffs,

v.

HALLMARK SPECIALTY INSURANCE
COMPANY

      Counter-Defendant.
_____/

**DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**HALLMARK SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY**
**JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Numerous genuine issues of material fact exist regarding the identity of the intended named insured which preclude entry of judgment as a matter of law on Hallmark Specialty Insurance Company's motion for summary judgment. The Court should not allow Hallmark to shirk its obligation to defend and indemnify its insureds, Lion Heart Surgical Supply Corp., Fabian Conde, and Janaina Nascimento (collectively, the "LH Defendants"), based on an obvious misnomer that mistakenly identified non-existent corporation Lion Heart Surgical Equipment Corp. as the named insured, instead of the intended named insured, Lion Heart Surgical Supply Corp.

I.  **FACTUAL BACKGROUND**

On August 22, 2018, at 9:33 a.m., Maggy Sosa, PAG Insurance Services, Inc.'s commercial accounts manager, emailed underwriter Eric Pray at USG Insurance Services, Inc., requesting a quote for commercial general liability insurance for Lion Heart Surgical Supply Corp. D.E. 85-15. The email attached an unsigned application that mistakenly listed two different proposed named insureds: Lion Heart Surgical Supply, LLC and Lion Heart Surgical Equipment Corp. *Id.*

USG is an insurance wholesale broker that acts as the "middleman between retail agents and the insurance carrier themselves." D.E. 79-2 at 12:5-8. USG also performs underwriting tasks including reviewing information submitted to it, developing a premium, and producing a binder/policy once an insured (through its retail agent) chooses to do so. *Id.* at 13:10-21. Retail agent PAG and USG operate under a "Preferred Limited Producers Agreement," which sets forth the terms by which USG and PAG conduct business. D.E. 85-2, D.E. 79-2 at 16:22-25, 17:1-8, 70:1-8.

USG is Hallmark's agent pursuant to a May 7, 2018 contract (the "USG/Hallmark Contract"), which sets forth USG's authority to act on behalf of Hallmark. D.E. 85-1, D.E. No. 79-2, at 14:24-25, 15:1-2. Pursuant to the USG/Hallmark Contract, Section I – Authority of the Agent, USG is permitted to "solicit, receive, and transmit to the manager [Hallmark Specialty

Underwriters, Inc.] proposals for insurance contracts for those lines of business and up to the maximum limits of coverage specified in Schedule A of this agreement." D.E. 85-1 at p. 1. Pursuant to this section, USG "receive[s] applications of insurance from a retail agent or agency, underwrite[s] it and then transmit[s] it to Hallmark once coverage has gone into effect." D.E. 79-2 at 23:23-24, 24:1-11. USG does not have to contact Hallmark in order to get approval to bind coverage if the applicant seeks coverage that falls within the scope of USG's authority under the USG/Hallmark Contract and within Hallmark's underwriting guidelines for the type of risk presented. *Id.* at 24:12-25, 25:1-10. USG also has access to Hallmark's internal systems to rate risk and determine premiums and can create documents bearing Hallmark's logo, such as the Proposal for Business Insurance that USG created for this risk. *Id.* at 43:23-25, 44:1-12; D.E. 85-13. USG acted on behalf of Hallmark to accept the application, rate the risk, and bind the Policy, and Hallmark agreed that USG acted within the scope of its authority in so doing. D.E. 79-2 at 14:24-25, 15:1-8; D.E. 85-9 at 87:10-17.

After receiving PAG's email and the quote request, Pray forwarded the unsigned application to USG's submissions department on August 22, 2018, at 11:46 a.m., where a USG employee manually input the name and address of the prospective insured, and then returned the file to Pray. D.E. 85-15.  Despite the fact that the commercial general liability section listed "Lion Heart Surgical Supply" as the proposed named insured, USG's processing center typed in the named insured as Lion Heart Surgical Equipment, LLC. D.E. 85-16; D.E. 79-1 at 39:1-19.

At 1:59 p.m., USG emailed a General Liability Quote, a Broker Agent Summary, Statement of Diligent Effort, and Florida Surplus Lines Disclosure back to PAG. D.E. 85-16. USG's 1:59 p.m. email included an internal summary page listing all the relevant information. *Id.*

PAG, at 2:33 p.m., emailed Lion Heart Surgical Supply Corp.'s officer, Fabian Conde, a summary of insurance coverage with the subject line "Lion Heart Surgical Equipment, LLC." D.E.

3

85-10.  Conde responded on August 23, 2018, at 1:14 p.m. and instructed PAG to correct the policy to reflect "LION HEART SURGICAL SUPPLY CORP." as the named insured. *Id.* (emphasis in the original). Sosa told Conde to sign the documents and advised that PAG would correct the name afterward. *Id.*  That same day, Conde signed an insurance application filled out by Sosa, listing Lion Heart Surgical Supply Corp. as the named insured. D.E. 85-3 at 79:10-13; D.E.85-4. Conde also executed a surplus lines disclosure and notice of terrorism insurance identifying Lion Heart Surgical Supply Corp. as the named insured. D.E. 85-5; D.E.85-6.

PAG emailed Conde again at 3:12 p.m. asking him to confirm the name of the named insured. D.E. 85-10. Conde responded three minutes later and confirmed the named insured as: LION HEART SURGICAL SUPPLY CORP. D.E. 85-10 (emphasis in the original). Unbeknownst to the LH Defendants, PAG emailed USG at 4:17 p.m. with the subject line "Lion Heart Surgical Corp Binder 8/23/2018" and attached the "Lion Heart Surgical Supply Corp. Bind[er] App[lication]" but stated in the body that the name should read: Lion Heart Surgical Equipment Corp. D.E. 41-3.

Sosa testified that she called Pray at USG later that day and instructed him to change the named insured to Lion Heart Surgical Supply Corp. D.E. 85-3 at 41:21-25, 42:1-17; 53:22-25, 54:1-7; 59:12-24, 82:18-22; 83:1-11. Sosa explained that she had developed a rapport with after working with him at a prior job and called him frequently. D.E. 85-3 at 42:20-25, 43:1-19. USG's Fed. R. Civ. P. 30(b)(6) representative, Randy Stockburger, confirmed that he has spoken to Sosa "well over 100 times." D.E. 79-2 at 15:3-12.

On August 30, 2018, PAG sent Conde a certificate of insurance listing Lion Heart Surgical Supply Corp. as the named insured. D.E. 85-17. Accordingly, Conde reasonably believed that the named insured was corrected, and commercial general liability insurance had been issued to Lion Heart Surgical Supply Corp. as he requested. D.E. 79-1 at 37:25, 38:1-7, 173:7-25, 174:1-8. Only

after the Underlying Action was filed against the LH Defendants did they learn that the Policy was mistakenly issued to Lion Heart Surgical Equipment Corp. ("Equipment Corp.") instead of Lion Heart Surgical Supply Corp. ("Supply Corp.") *See* Ex 1, November 18, 2019 Reservation of Rights Letter. Conde plainly intended to obtain commercial general liability insurance for Supply Corp., and not non-existent Equipment Corp. D.E. 79-1 at 20:14-19, 30:7-11, 40:20-23, 51:10-16, 119:4-10;  D.E. 49 at ¶¶ 9,14, 20.

## II.      LEGAL STANDARDS

The district court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but only to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment bears a heavy burden of demonstrating the absence of factual issues. *Herzog v. Castle Rock Entertainment,* 193 F. 3d 1241, 1246 (11th Cir. 1999).

This Court, sitting in equity, has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument. *See Goodall v. Whispering Woods Ctr., L.L.C.,* 990 So. 2d 695, 699 (Fla. 4th DCA 2008). A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument. *Id. "*Reformation is also is proper when there is a mistake on the part of one side of the transaction and inequitable conduct on the part of the other side." *Id.* Moreover, a court may also reform a contract due to a "simple mistake." *Lumbermens Mut. Cas. Co. v. Martin*, 399 So. 2d 536, 537 (Fla. 3d DCA 1981).

## III.      ARGUMENT

### A.      *A Mutual Mistake Or Simple Mistake Occurred When Hallmark, and/or its Agent, USG, Issued The Policy To A Non-Existent Company*

The Court should deny Hallmark's motion because (1) the parties' intentions are a question

of fact, (2) there is a genuine dispute of material fact regarding whether a mutual mistake occurred, and (3) even if a mutual mistake did not occur, the Court can reform the policy due to a simple mistake.

### 1. The Parties' Intentions Are A Question Of Fact

Despite Hallmark's self-serving assertions to the contrary, the LH Defendants patently intended to insure Supply Corp., and not a non-existent entity. D.E. 85-3 at 41:21-25, 42:1-17; 53:22-25, 54:1-7; 59:12-24, 82:18-22; 83:1-11; D.E.85-4; D.E. 85-5; D.E. 85-6; D.E. 85-8; D.E. 85-10; D.E. 85-11; D.E. 79-1 at 20:14-19, 30:7-11, 40:20-23, 51:10-16, 119:4-10. During the procurement and application process, Conde twice instructed his insurance agent, in writing, that the named insured had to read "LION HEART SURGICAL SUPPLY CORP." D.E.85-10; D.E. 85-11. Supply Corp.'s insurance agent, Sosa, filled out an application for insurance, surplus lines disclosure, and terrorism coverage form that all identified Supply Corp. as the named insured. D.E. 85-3 at 79:10-13, 81:5-8. Sosa testified that at the time she filled out that application, she understood the named insured to be Lion Heart Surgical Supply Corp. D.E. 85-3 at 81:5-8. Conde signed that application for insurance and it was submitted to Hallmark's agent/underwriter, USG in order to bind coverage. D.E. 85-4; D.E. 85-5; 85-6. The LH Defendants never used the word "equipment" or even contemplated using "equipment" as part of its company name. D.E. 79-1 at 33:9-13, 35:19-25, 36:1-11. USG's representative admitted that USG would not purposefully bind coverage for a company that does not exist and would not put any coverage into effect for a business that does not exist. D.E. 79-2 at 64:21-25, 65:1-5. Based on this testimony, it is clear that USG, acting within the scope of its authority as Hallmark's agent, never intended to insure non-existent Equipment Corp. instead of Supply Corp. And even Hallmark admitted that the intended named insured is Supply Corp. Ex. 1 at p. 2 ("Based on a search of the Florida Secretary of State website, there is no company known as 'Lion Heart Surgical *Equipment Corp.*' Accordingly, it

appears that Lion Heart Surgical *Supply Corp.* is the intended Named Insured.") (emphasis in the original).

Hallmark ignores the above evidence and instead contends that the LH Defendants intended to insure Equipment Corp. based on Sosa's email to Pray at USG, wherein Sosa stated that the named insured should read "Lion Heart Surgical Equipment Corp." D.E. 79 at ¶ 4. But Sosa testified, as the Fed. R. Civ. P. 30(b)(6) representative of PAG, that after she sent that email to Pray, she called him and told him to change the named insured to "Lion Heart Surgical Supply Corp.," consistent with Conde's unequivocal instructions. D.E. 85-3 at 41:21-25, 42:1-17; 53:22-25, 54:1-7; 59:12-24, 82:18-22; 83:1-11.  Sosa explained that she had developed a rapport with Pray over their long working relationship, and that she frequently called him on the phone.  D.E. 85-3 at 42:20-25, 43:1-19.   Even USG's Fed. R. Civ. P. 30(b)(6) representative, Randy Stockburger, testified that he has spoken to Sosa "more than 100 times." D.E. 79-2 at 15:3-12. This course of dealing between PAG and USG is undisputed, and Sosa's testimony contradicts the email on which Hallmark relies. This genuine issue of material fact cannot be resolved on summary judgment.

Whether a mutual mistake occurred turns on the highly factual analysis of the parties' intentions. "The question of intent is a matter left to the trier of fact for determination." *St. Paul Guardian Ins. Co. v. United States*, 117 F. Supp. 2d 1349, 1356 (S.D. Fla. 2000); *see also Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995); *First Jackson Capital & Mgmt., LLC v. Falcone Group, LLC*, 09-80797-CIV, 2010 WL 11647370, at *14 (S.D. Fla. Apr. 15, 2010) ("the question of whether or not the parties' negotiations produced a binding agreement that is not embodied in the signed document is a question of intent, which in turn is a question of fact"). Although Hallmark contends that all parties intended to insure non-existent Lion Heart Surgical Equipment Corp., numerous facts (including correspondence from its own

attorney) contradict its position.  Accordingly, the identity of the intended named insured is plainly a question of fact that should be resolved by a jury, and the Court should deny Hallmark's motion.

### 2. A Mutual Mistake Occurred

Over the course of the underwriting process, PAG and USG inexplicably came up with four different proposed named insureds: Supply LLC, Supply Corp., Equipment Corp., and Equipment LLC. D.E. 85-4; D.E. 85-5; D.E. 85-6; D.E. 85-15; D.E. 85-16. This demonstrates that a scrivener's error was made on the application and binding documents and justifies reformation of the Policy.

Next, PAG admitted it made a mistake. Sosa testified that "we made a mistake in the name, and that mistake was made by me." D.E. 85-3 at 66:11-15. Sosa explained that "[i]n the email that [Conde] sent you can see that he wanted the name to Lion Heart Surgical Supply Corp., which was mistake, my mistake, but he did, he requested that the name be changed." *Id.* at 68:10-13. But Sosa attempted to fix that mistake by calling Pray and asking him to change the name to Supply Corp. D.E. 85-3 at 83:5-11. USG subsequent failure to correct the name demonstrates inadvertence, which also supports reformation.

PAG and Hallmark's agent, USG, clearly made a mutual mistake by allowing the Policy to be issued to a non-existent entity – especially since PAG instructed USG to change the named insured to Supply Corp. and USG failed to do so. D.E. 85-3 at 41:21-25, 42:1-17; 53:22-25, 54:1-7; 59:12-24, 82:18-22; 83:1-11. In fact, Hallmark and USG made numerous other mistakes throughout the underwriting process. First, on August 22, 2018, PAG emailed USG for an insurance quote and provided an application that listed two different named insureds on two different sections. D.E. 85-15. The commercial general liability section listed Supply LLC as the named insured and the commercial property section (which coverage was not sought) listed Equipment Corp. *Id.* No one at USG noticed the two different names or inquired as to which one

was correct. USG responded a few hours later and provided various documents which incorrectly listed Equipment LLC as the proposed named insured. D.E. 85-16. When questioned on the apparent discrepancy, USG's representative testified that USG's processing and submission department typed in the name insured as Equipment, LLC. D.E. 79-2 at 34:13-25, 35:1-11. Second, USG received a signed application and disclosures listing Supply Corp. as the named insured, but apparently never read those documents. D.E. 41-3. Third, Hallmark and USG have no policies or procedures in place to verify that they are not insuring non-existent entities. D.E. 85-9 at 76:6-14. Fourth, USG testified that it would not purposefully bind coverage for a company that does not exist and would not put any coverage into effect for a business that does not exist. D.E. 79-2 at 64:21-25, 65:1-5. Although USG asserted that it was "not necessarily" a mistake to insure non-existent Equipment Corp., it plainly did not intend to do so based on its testimony that it would not put coverage into effect for a business that does not exist. D.E. 79-2 at 65:7-11. Most importantly, PAG instructed USG to correct the named insured to Supply Corp. before the Policy was issued and USG failed to change the insured's name. D.E. 85-3 at 41:21-25, 42:1-17; 53:22-25, 54:1-7; 59:12-24, 82:18-22; 83:1-11. Hallmark acknowledged that USG acted within the scope of its authority throughout this transaction, and Hallmark is bound by its agent's actions. D.E. 85-9 at 87:10-17; *Palafrugell Holdings, Inc. v. Cassel*, 940 So. 2d 492, 494 (Fla. 3d DCA 2006) (citing *Indus. Ins. Co. v. First Nat'l Bank,* 57 So. 2d 23, 26 (Fla.1952)) ("The Florida Supreme Court has said that '[t]he acts of an agent, performed within the scope of his real or apparent authority, are binding upon his principal.'").

USG should have been aware on numerous occasions of the discrepancy related to the named insured – throughout a two-day period, documents were provided to (or created by) USG listing no fewer than four different potential named insureds. USG's testimony that it would never purposely bind coverage for a non-existent entity demonstrates that a mistake occurred, or at a

9

minimum, a question of fact exists thereby precluding summary judgment. If USG does not purposely bind coverage for non-existent entities, then any situation in which it does is plainly due to a mistake.

### 3. Reformation Is Proper Even If A Mutual Mistake Did Not Occur Due to Hallmark and its Agent USG's Inequitable Conduct

Even if the Court finds there was no mutual mistake by both parties, reformation is still proper based on Hallmark and USG's inequitable conduct. *Goodall v. Whispering Woods Ctr., L.L.C.,* 990 So. 2d 695, 699 (Fla. 4th DCA 2008)( *"*Reformation is also is proper when there is a mistake on the part of one side of the transaction and inequitable conduct on the part of the other side."). Both USG and Hallmark's Fed. R. Civ. P. 30(b)(6) representatives testified at length about the information they rely on to determine the premium charged for the Policy. D.E. 79-2 at 44:17-25, 45:1-7; 45:15-25, 46:1-16; 47:21-25, 48:1-8, 48:9-11; D.E. 85-9 at 46:9-18, 33:3-22. Both agreed that the name of the proposed named insured has no bearing on the decision whether to insure the risk, or what premium to charge. D.E. 79-2 at 52:19-24; D.E. 85-9 at 46:9-18. Despite undisputed testimony that the name of the insured does not matter during the underwriting process, Hallmark is refusing to defend and indemnify its rightful insureds due to this insignificant issue. As Hallmark made plain, it would not want to know whether a potential insured existed prior to issuing a policy – it just collected the premium and turned a blind eye. D.E. 85-9 at 74:8-15.

USG inputted the following information into Hallmark's "HSU" system, an internet-based rating engine, which was used to determine the premium charged for the Policy. *Id.* at 51:15-17; 52:3-6.

| COMMERCIAL GENERAL LIABILITY | | |
|---|---|---|

**Description of Classifications Below**

| Classification # | Location | County |
|---|---|---|
| 1 | 2130 Van Buren #206, HOLLYWOOD FL 33020 | BROWARD |

| Class Code Description | Prem Basis/Exposure | Prem/Ops Rate | Prem/Ops Premium | Prod/Comp Ops Rate | Prod/Comp Ops Premium | Class Premium |
|---|---|---|---|---|---|---|
| (16750) Internet Retailers | Gross Sales / $500,000 | 0.71 | $355 | Excl | Excl | $355 |

     a.      The classification number. USG used one classification because the applicant only did one type of business activity. D.E. 79-2 at 44:17-25, 45:1-7; 45:15-25, 46:1-16; D.E. 85-13 at p. 2.

     b.      The class code. USG determined the class code as "16750 Internet Retailers." D.E. 79-2 at 47:21-25, 48:1-8.

     c.      The physical address or location. *Id.* at 47:9-15.

     d.      The county where the risk is located. *Id.* at 47:16-20.

     e.      The premium basis or exposure. USG used the applicant's gross sales of $500,000. *Id.* at 48:9-11.

     f.      The premium/operations rate. USG assigned a rate of .71 using Hallmark's online "HSU" rating system.  *Id.* at 48:12-20.

USG testified that the name of the named insured does not impact the HSU rating. *Id.* at 52:19-24. Further, the name of the named insured does not impact the premium charged for the policy. D.E. 85-9 at 46:9-18; D.E. 85-14; D.E. 79-2 at 52:19-24. Hallmark also admitted that the named insured entered into Hallmark's rating portal for classification 16750 internet retailers is "totally irrelevant to the premium calculation." D.E. 85-9 at 46:9-18. And USG stated that a one-word difference between Lion Heart Surgical *Supply* Corp. and Lion Heart Surgical *Equipment* Corp. would not affect the policy or premium. D.E. 79-2 at 50:10-21, 52:19-24, 53:13-21. 58:9-

11

21. In fact, USG could change the named insured from Lion Heart Surgical *Equipment* Corp. to Lion Heart Surgical *Supply* Corp. without any change to the premium. *Id.* at 58:9-21. USG also explained it has Hallmark's authority to change the name of a named insured on an in-force policy, and USG would not have to obtain Hallmark's approval to do so. D.E. 79-2 at 25:11-16; 26:21-25; 27:11-22. It is undisputed that the named insured was not important – until a claim was made against Supply Corp., and Hallmark sought an excuse to avoid its obligations to its insureds.

Even if PAG was the only one that made a mistake (as Hallmark argues), reformation is still proper based on Hallmark and USG's inequitable conduct. The one-word difference between Lion Heart Surgical *Supply Corp.* and Lion Heart Surgical *Equipment Corp.* would not affect the risk, rating, or the premium. D.E. 79-2 at 50:10-21, 52:19-24, 53:13-21. 58:9-2. The record evidence demonstrates that Hallmark's refusal to defend and indemnify Supply Corp., Conde, and Nascimento due to the named insured issue results from inequitable conduct, and the Court should therefore deny Hallmark's motion for summary judgment.

### B.    *The Court Can Reform The Policy Due To A Simple Mistake*

This Court may also reform the Policy due to a "simple mistake" to correct an obvious misnomer – in this case, one word in the name of the named insured. *See Lumbermens Mut. Cas. Co.*, 399 So. 2d at 537 ("a simple mistake had been made, the policy was properly reformed to change the named insured"); *see also Hanover Ins. Co. v. Publix Market, Inc.*, 198 So. 2d 346 (Fla. 4th DCA 1967) (insurance policy, which incorrectly names non-existent entity as insured, reformed to name correct entity). There is no dispute that at a minimum, a simple mistake was made and the intended entity was not insured.  The Court should exercise is authority, sitting in equity, to reform this Policy to correct the named insured to Supply Corp.

In *Publix Market,* the policy erroneously insured Taft-Hollywood Merchants Association, Inc., which was a non-existent non-profit corporation at the time the policy was issued and never

came into being. *Id.* at 347. Taft-Hollywood Merchants Association was an unincorporated association composed of a number of merchants occupying space in the shopping center. *Id.* Months after the policy was issued, a platform collapsed resulting in several claims for personal injuries. *Id.* The insurance company refused to accept responsibility and took the position the insured was the non-existent non-profit corporation named in the policy, not Taft-Hollywood Merchants Association. *Id.* After hearing evidence at the final hearing, the trial judge entered a decree reforming the policy so that the named insured be described as "Taft-Hollywood Merchants Association, not incorporated to conform to the true intent of the parties." *Id.*

The facts of this action are very similar to *Publix Market*. Hallmark issued a policy to Equipment Corp., which was a non-existent corporation that never existed or came into being. D.E. 79-1 at 21:22-25, 22:1-10. Hallmark has refused to accept responsibility and has taken the position that the insured is the non-existent corporation, Equipment Corp. D.E. 1 & 41.  Like the plaintiff in Publix Market, the LH Defendants seek to reform the policy by changing *one word* in the name of the named insured to reflect the true intent of the parties so that Supply Corp. is the named insured. Such a change would reflect the LH Defendants', PAG's, and USG's true intentions to insure a business that actually exists, and would not prejudice Hallmark. Indeed, Hallmark's underwriter, USG, repeatedly testified that changing one word is a simple matter and would not affect the premium. D.E. 79-2 at 58:17-21 (Q: Would there have been any additional premium associated with that name change? A: This particular name change, no."). Accordingly, Hallmark should not be permitted to avoid defending and indemnifying its rightful insureds against a $6 million claim based upon a one-word mistake. Even if there was no mutual mistake as Hallmark incorrectly argues, the LH Defendants should be allowed to present their evidence at a final hearing like the Plaintiff in *Publix Market* that a simple mistake occurred. The Court should therefore deny Hallmark's motion for summary judgment.

C.     *Hallmark Waived Its Right to Seek Relief Under The Criminal Acts Exclusion By Failing to Raise It In Its Pleadings*

Hallmark incredibly seeks judgment as a matter of law on a coverage exclusion that it never pled in its Amended Complaint or among its 39 affirmative defenses to the Counterclaim. The Court should not entertain Hallmark's improper effort to amend its pleadings through a motion for summary judgment, and should find that it is barred from raising a new exclusion months after the deadline to amend pleadings. Hallmark was on notice of this potential defense before filing this lawsuit and failed to plead it, or timely seek leave to amend (despite a finding from Magistrate Judge Strauss that discovery related to this issue was outside the scope of the pleadings, and that if Hallmark sought to proceed on this defense it should seek leave to amend). The Court should therefore decline to rule on this unpled Criminal Acts exclusion and find that Hallmark waived its right to seek a declaration of no coverage on these grounds.

"It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n. 27 (11th Cir. 2012); *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir.2004) (per curiam) ("A plaintiff may not amend [his or her] complaint through argument in a brief opposing summary judgment."); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir. 2006). Moreover, a party may not amend its affirmative defenses through a motion for summary judgment. *Keen v. Reg'l Emergency Med. Servs. of Georgia, Inc.,* 913 F. Supp. 2d 1374, 1381 (M.D. Ga. 2012) ("Much like a plaintiff cannot amend his complaint through summary judgment pleadings, Defendant cannot use summary judgment to amend its answer to raise an affirmative defense. Thus, this portion of Defendant's summary judgment motion is denied and the failure to mitigate defense is deemed waived"). And it is blackletter law that "failure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1239 (11th Cir. 2010). Furthermore,

14

"[c]ourts generally lack the ability to raise an affirmative defense *sua sponte.*" *Roberts v. Gordy*, 877 F.3d 1024, 1028 (11th Cir. 2017).

Hallmark's noticeable lack of citation to its pleadings is telling.  It is undisputed that Hallmark did not plead any allegations related to the Criminal Acts exclusion in its complaint, amended complaint, or its affirmative defenses and, thus, Hallmark waived that defense. *See* D.E. 1, 41, and 59. Hallmark has not requested leave to amend its pleadings to assert this defense, and should not be permitted to do so belatedly and improperly through a motion for summary judgment. Not only has the deadline to amend the pleadings long passed, but Hallmark does not have good cause to amend. *Keen*, 913 F. Supp. 2d at 1381 (M.D. Ga. 2012).

The fact that Hallmark's insured, Nascimento, was the subject of a federal criminal investigation was known (or knowable) to Hallmark at multiple points before it filed this lawsuit, and before the October 20, 2020 deadline to amend pleadings. D.E. 46. Specifically, Hallmark knew or should have known about the criminal investigation on each of the following dates:

- July 15, 2020: The Underlying Action was unsealed, which repeatedly referenced ongoing criminal investigations of Hallmark's insured. *See Johnson & Johnson v. XS Supply, et al.*, Case No. 8:19-CV-1673-T-33AEP, D.E. 235

- October 2, 2020: The LH Defendants (through Hallmark-paid appointed defense counsel) filed a motion for protective order regarding the depositions of the LH Defendants and to temporarily stay the Underlying Action pending completion of criminal proceedings. Ex. 3. The motion disclosed that U.S. Attorney for the Eastern District of Kentucky intended to prosecute Nascimento and advised her of two possible outcomes: a grand jury indictment or entry of a guilty plea. The motion was filed in the public record and Hallmark knew or should have known about it – especially since it paid for the LH Defendants' defense in the Underlying Action.

- January 11, 2021: The criminal charges against Nascimento were filed. D.E 69.

- February 2021: Nascimento entered into a plea agreement. D.E. 69.

Despite Hallmark's long knowledge of the criminal investigation and near-certain criminal prosecution of Nascimento, Hallmark did not assert the Criminal Acts exclusion in its November

18, 2019, or May 26, 2020 reservation of rights letters, much less its pleadings. Ex. 1 & 2. Although Hallmark glossed over its failure to plead this exclusion in its motion for summary judgment, it is anticipated that on reply it will assert that the Criminal Acts exclusion was not ripe until February 2021 after Nascimento's guilty plea was entered on the criminal docket.  But this argument fails to explain why Hallmark never sought leave to amend its complaint.[1] Because Hallmark failed to raise the criminal acts exclusion in its pleadings and failed to seek leave to amend – despite its knowledge of Nascimento's criminal investigation, plea, and sentencing – Hallmark waived the right to assert and seek declaratory relief under the Criminal Acts exclusion.

   **D.    *Even If The Criminal Acts Exclusion Was Properly Before Court, The Exclusion Does Not Bar Coverage***

   **1.   Nascimento's Acts Do Not Preclude Coverage For Claims Against Supply Corp. or Conde**

   Hallmark improperly seeks a ruling that as a matter of law the Criminal Acts exclusion in the Policy bars coverage for all of its insureds: Nascimento, Conde, and Supply Corp.  If the Court entertains argument regarding this unpled exclusion, at most it could be construed to exclude

---

[1] Hallmark first raised Nascimento's criminal charges and plea (but not the exclusion) on Friday, March 5, 2021, at 3:54 P.M. when it served an amended notice of taking deposition of Supply Corp.'s corporate representative, adding new areas of inquiry related to Nascimento's criminal charges. The LH Defendants objected and set a hearing before Magistrate Judge Jared M. Strauss on March 9, 2021. Less than two hours before the hearing, Hallmark served its third reservation of rights letter, which raised the exclusion. Ex. 4.  Magistrate Judge Strauss granted the LH Defendants' motion for protective order. D.E. 74. During the hearing, Magistrate Judge Strauss noted that Hallmark raised numerous specific affirmative defenses including other intentional acts exclusions, yet failed to specifically plead the criminal acts exclusion. D.E. 80, Hearing Trans. at 8:2-15; 22-21-25, 23:1-25, 24:1-25, 25:1-10. He also made clear that the Criminal Acts exclusion was not at issue or relevant to the action, absent an amendment of the pleadings by Hallmark. D.E. 74 ("To the extent that Hallmark seeks to amend its pleadings to include allegations pertaining to specific exclusions under the subject insurance policy that would clarify the relevant of the areas of inquiry represented by topics 23-25, Hallmark shall make an appropriate motion for the District Court's consideration"). Despite Magistrate Judge Strauss's clear order that Hallmark needed to seek leave to amend its pleadings to assert additional specific exclusions such as the Criminal Acts exclusion, Hallmark has failed to do so.

coverage for Nascimento, and Hallmark would have to continue defending (and ultimately indemnify) Conde and Supply Corp.

Section II of the Policy ("Who is an Insured") provides in Section 1d that if "you are designated in the Declarations as … an organization other than a partnership, joint venture, or limited liability company, you are an insured. Your 'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors." D.E. 41-2 at p. 27. Conde and Nascimento, as officers and directors of Supply Corp., fit within this definition and are insureds along with Supply Corp. The Criminal Acts exclusion under Coverage B provides that "[t]his insurance does not apply to: 'Personal and advertising injury' arising out of a criminal act by or at the direction of *the* insured." D.E. 41-2, p. 24. (*emphasis added*).

Use of the term "the" before "insured" in this exclusion, as opposed to the term "an" or "any", defeats any argument that the claims against Supply Corp. and/or Conde – innocent insureds – are barred by Nascimento's criminal acts, as she is separately insured under the Policy. Limitations or exclusions in insurance policies must be narrowly construed. *Cochran v. State Farm Mut. Auto. Ins. Co.*, 298 So. 2d 173, 174  (Fla. 4th DCA 1974). Where coverage and exclusions are defined in terms of "the insured," the insurance contract between the insurer and the several insureds is considered to be separable rather than joint. *Allstate Ins. Co. v. McCraine*, 716 F.Supp. 1440, 1447-48 (S.D. Fla. 1989) ("determination of whether policy precludes coverage for the action... turns on whether the policy imposes a joint obligation between insureds and the insurer or whether the policy was several, creating a separate contract with each insured."). The overwhelming majority of jurisdictions that have considered this issue have interpreted "the insured" language in an exclusionary clause to refer to a particular insured and extended liability coverage to an innocent insured. *See, e.g.*, *American States Ins. Co. v. Borbor*, 826 F.2d 888, 894

(9th Cir. 1987).[2]

In *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 117 F.3d 1328, 1336 (11th Cir. 1997), the Eleventh Circuit, interpreting Florida law, echoed the prevailing view among courts across the country. That court noted that severability of contractual provisions protects a named insured from the contractually violate acts of a co-insured. *Id.* The determination of severability depends on the contract language at issue. *Id.* A policy which uses the phrase "any insured" may preclude coverage for all insureds if there is fraud or dishonestly by "any insured." *Id.* (*citing State Farm Fire & Cas. Ins. Co. v. Kane*, 715 F. Supp. 1558, 1561-62 (S.D. Fla. 1989). Inclusion of the phrase "the insured," on the contrary, permits an innocent co-insured to recover. *Id.* (*citing Michigan Millers Mut. Ins. Corp. v. Benfield*, 902 F. Supp. 1509, 1513 (M.D. Fla. 1995)) (Florida's doctrine of the innocent co-insured provides that an innocent co-insured may recover under an insurance policy even where the loss was caused by another co-insured's intentional acts unless the insurance policy at issue makes clear that the policy at issue provides for joint coverage rather than several coverage.) Additionally, "Florida courts have found that the term "the assured" is, at least, ambiguous and requires a finding of severability." *Id.* (*citing Auto-Owners Ins. Co. v. Eddinger*, 366 So. 2d 123, 124 (Fla. 2d DCA 1979). Importantly, "the Florida Supreme Court cited *Eddinger's* innocent co-insured doctrine with approval in *Everglades Marina, Inc. v. American Eastern Dev. Corp.*, 374 So. 2d 517, 519 (Fla. 1979)." *Id.*

Binding precedent establishes that the language "the insured" used by Hallmark in the

---

[2] *See also Western Cas. & Sur. Co. v. Aponaug Mfg. Co.*, 197 F.2d 673 (5th Cir. 1952); *Arenson v. Nat'l Auto. & Cas. Ins. Co.*, 286 P.2d 816 (Cal. 1955); *Fire Ins. Exchange v. Altieri*, 235 Cal. App. 3d 1352 (1991); *National Union Fire Ins. Co. v. Lynette*, 228 Cal. App. 3d 1073 (1991); *Allstate Ins. Co. v. Worthington*, 46 F. 3d 1005 (10th Cir. 1995); *Pawtucket Mut. Ins. Co. v. Lebrecht*, 190 A.2d 420 (N.H. 1963); *McBride v. Lyles*, 303 So. 2d 795 (La. Ct. App. 1974); *Cambridge Mut. Fire Ins. Co. v. Perry*, 692 A.2d 1388 (Me. 1997); *Hanover Ins. Co. v. Crocker*, 688 A.2d 928 (Me. 1997); *Property Cas. Co. of MCA v. Conway*, 687 A.2d 729 (N. J. 1997); *Unigard Mut.Ins. Co. v. Argonaut Ins. Co.*, 579 P.2d 1015 (Wash. App. 1978).

Criminal Acts exclusion demonstrates its intent to provide a separate and independent coverage analysis for each of the Policy's insureds, or at the very least, is ambiguous and requires severability. Summary judgment is not appropriate because the record of devoid of any evidence of wrongdoing by Supply Corp. or Conde. Likewise, Hallmark's pleadings and motion for summary judgment do not mention any criminal conduct by Conde or Supply Corp. (or anyone at the direction of Supply Corp.). Indeed, as Hallmark correctly pointed out, Nascimento's actions were on behalf of Supply, *LLC*, which all parties agree is a non-insured entity. D.E. 78, p. 4, 7, 15. Nascimento pled guilty to acts she engaged in on behalf of Supply, LLC – not Supply Corp. or Conde. D.E. 79-7. There are no allegations, criminal investigations, criminal proceedings, or findings that Conde or Supply Corp. engaged in any criminal activity that could preclude coverage.

If Hallmark intended to exclude claims against all insureds based on the criminal acts of one insured, it should have used the term "an" or "any" before "insured" in the Criminal Act exclusion as opposed to "the" insured. Hallmark recognized the distinction between those two terms because it used "an" and "any" in other exclusions in the Policy. *See e.g.,* D.E 79-3, Section I-2(c), (f), (g) (h), Section II-1(j), (n); *Pawtucket Mut. Ins. Co. v. Lebrecht*, 190 A.2d 420, 422-23 (N.H. 1963) ("It is reasonable to assume that when the [insurance] company used the definite expression "the Insured" in certain provisions of the policy and the more indefinite or general expression "any Insured" or "an Insured" in other provisions, it intended to cover differing situations which might come within the terms of the policy.").

The cases relied on by Hallmark interpreting the term "arising out of" are inapplicable because neither of those cases involved the issue of whether an exclusion was joint or severable. At best, those cases are only applicable to exclude coverage for Nascimento and Supply LLC. But Conde or Supply Corp.'s potential liability does not "arise out of" their nonexistent criminal acts, and there is no record evidence that either committed any criminal acts. As noted repeatedly by

every court that has confronted the "the insured" issue, an excluded act of one insured does not

bar coverage for additional insureds who have not engaged in the excluded conduct. Accordingly,

the Court should deny Hallmark's motion as to Conde and Supply Corp.

### 2. Hallmark Is Required To Defend The Entire Underlying Action, Regardless Of Nascimento's Plea To A Misdemeanor

It is a basic tenet of insurance law that if the underlying complaint alleges

facts partially within and partially outside the scope of coverage, the insurer is obligated to defend

the entire suit. *Trizec Prop., Inc. v. Biltmore Constr. Co*., 767 F.2d 810, 811–12 (11th Cir. 1985).

This holds true even if the underlying action may eventually produce a result which in fact does

not trigger a duty to indemnify. *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360

(M.D. Fla. 2001) "Consequently, an insurer may be required to defend a suit even if the later

true facts show that there is no coverage." *Trizec*, 767 F. 2d at 812. The merits of the underlying

suit have no bearing on whether the duty is owed. *Trailer Bridge, Inc. v. Illinois Nat. Ins. Co.*, 657

F.3d 1135, 1142 (11th Cir. 2011).

Hallmark concedes that the Criminal Acts exclusion does not extend to Conde. D.E. 78, at

p. 15-16; *see also supra* Section IV.D.1. Hallmark has not set forth any evidence – nor can it –

that Conde was involved in any criminal act that would eliminate Hallmark's duty to defend. Even

if the exclusion would apply, and thus Hallmark's duty to defend Nascimento ceased, Hallmark is

still required to defend the entire Underlying Action as to its other insureds Conde and Supply

Corp. Accordingly, the LH Defendants are entitled to defense and indemnity in the Underlying

Action and Hallmark's motion for summary judgment should be denied.

### 3. Nascimento's Plea To A Misdemeanor Of Introduction Of A Misbranded Device Does Not Bar Coverage For All Claims In The Underlying Action

Even if the Court finds that Nascimento's plea to a misdemeanor triggers the Criminal Acts

exclusion, Hallmark is still required to defend and indemnify most of the claims in the Underlying

Action that do not relate to Nascimento's misdemeanor conviction. Nascimento only pled guilty to a single charge: introducing a misbranded device into interstate commerce under 21 U.S.C. §331(a). D.E. 79-7. The elements of the underlying claims do not relate to or arise out of Nascimento's charge of introducing a misbranded device into interstate commerce. For example, unjust enrichment (Count 9), requires that the (1) plaintiff (*i.e.* Johnson & Johnson) confer a benefit on defendant (Nascimento), who has knowledge thereof, (2) defendant voluntarily accepts and retains the benefit conferred, and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without the value thereof to the plaintiff. *See Hillman Const. Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. 4th DCA 1994). None of the elements or facts in the introducing a misbranded device into interstate commerce claim would support an unjust enrichment claim – especially since unjust enrichment requires Johnson & Johnson's participation in conferring the benefit. At most, coverage may be excluded for Count 3 – False Description and Designation of Origin in Commerce – since it is substantially similar to the misdemeanor of introducing a misbranded device into interstate commerce. But the remaining eight counts are within the scope of coverage, and Hallmark is obligated to defend the entire suit. Accordingly, Hallmark's motion for summary final judgment should be denied.

## IV.    CONCLUSION

WHEREFORE, the LH Defendants submit that genuine issues of material fact exist, thereby precluding summary judgment. Accordingly, Hallmark's Motion for Summary Final Judgment should be denied in its entirety.

Respectfully submitted,

**WOLFE | PINCAVAGE**
2937 SW 27th Avenue, Suite 302
Miami, FL 33133
Office: 786.409.0800

By:     /s/ Danya J. Pincavage, Esq.
        Danya J. Pincavage
        Fla. Bar No.: 14616
        danya@wolfepincavage.com
        Omar Ali-Shamaa
        Fla. Bar No.: 121461
        omar@wolfepincavage.com

        *Attorneys for Lion Heart Surgical Supply,*
        *LLC, Lion Heart Surgical Supply Corp.,*
        *Fabian Conde and Janaina D. Nascimento*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of April 2021, the foregoing was filed with the

Court's CM/ECF system, which will send notice to the parties in this ligation *via* Email as follows:

| | |
|---|---|
| Rory Eric Jurman, Esq.<br>Hinshaw & Culbertson LLP<br>One East Broward Blvd, Suite 1010<br>Ft. Lauderdale, FL 33301<br>rjurman@hinshawlaw.com<br><br>*and*<br><br>William C. Morison<br>wcm@morisonproughlaw.com<br>Morison & Prough, LLP<br>2540 Camino Diablo, Suite 100<br>Walnut Creek, CA 94597<br>Phone: 925-937-9990<br>Fax: 925-937-3272<br>*Counsel for Hallmark Specialty Insurance Company* | Gus Michael Centrone<br>gcentrone@kmf-law.com<br>James E. Felman<br>jfelman@kmf-law.com<br>Katherine Earle Yanes<br>kyanes@kmf-law.com<br>Kynes Markman & Felman, P.A.<br>PO Box 3396<br>Tampa, FL 333601<br>Phone: 813-229-1118<br>Fax: 813-221-6750<br>*Counsel for Defendant XS Supply, LLC* |
| Alice R. Huneycutt<br>Florida Bar No. 293105<br>STEARNS WEAVER MILLER WEISSLER<br>ALHADEFF & SITTERSON, P. A. | |

SunTrust Financial Centre, Suite 2100
401 E. Jackson Street (33602)
Post Office Box 3299
Tampa, Florida  33601
Telephone:  (813) 222-5031
Facsimile:  (813) 222-5089
Primary:  ahuneycutt@stearnsweaver.com
Secondary:  mkish@stearnsweaver.com

*and*

Geoffrey Potter
(NY Bar No: 2252302)
Joshua R. Stein
(NY Bar No: 5387394)
Jacqueline Lash
(NY Bar No: 5534953)
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
gpotter@pbwt.com
jstein@pbwt.com
jlash@pbwt.com

*Attorneys for Defendants Johnson & Johnson,*
*Ethicon, Inc., and Ethicon US, LLC*

By:    /s/ Danya J. Pincavage
         Danya J. Pincavage